IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**BOBBY SHANE CHARLTON**,

          Plaintiff,

    v.

**F. YEPEZ; C. FITZGERALD; M. WARE; J. DAVIS; S. BRUNING; B. DUNCAN; M. WILLINGHAM; S. REIDMAN; C. KROPORNICKI; LT. PETERS; R.N. PERSINGER; C. OLSEN; A. GONZALEZ; SGT. ARGUELLO; SGT. GALLINO; CAPT. WALKER; JERI TAYLOR**, all
in their individual and official capacities,

          Defendants.

No. 2:16-cv-00901-MC

**OPINION AND ORDER**

_____

**MCSHANE, Judge**:

Bobby Shane Charlton brings this civil rights action against seventeen Oregon prison officials. Mr. Charlton alleges in relevant part that he was the victim of both excessive force and deliberate medical neglect while an inmate at Eastern Oregon Correctional Institution. He asserts claims pursuant to 42 U.S.C. § 1983 for deprivations of his Fourteenth Amendment right to procedural due process and Eighth Amendment right to be free from cruel and unusual punishment.[1] Defendants move for summary judgment as to each of Mr. Charlton's claims. Although no reasonable jury could find that any defendant used excessive force against Mr.

---

[1] Mr. Charlton's Eighth Amendment claims technically arise under the Due Process Clause of the Fourteenth Amendment because the Eighth Amendment's protections apply to the states by operation of the Due Process Clause. *See Robinson v. California*, 370 U.S. 660, 657 (1962). In the interest of clarity, however, the Court refers to Mr. Charlton's substantive due process claims (i.e., those for excessive force and deliberate indifference) as Eighth Amendment claims and his procedural due process claims (i.e., those for inadequate procedural protections prior to the denial of a protected liberty interest) as Fourteenth Amendment claims.

Charlton or that Mr. Charlton was denied procedural due process, there remains a genuine dispute of fact as to whether eight of the defendants were deliberately indifferent to his serious medical need. Defendants' Motion for Summary Judgment is therefore GRANTED in part.

## BACKGROUND

Bobby Shane Charlton was an inmate at Eastern Oregon Correctional Institution ("EOCI") from September 9, 2014 to June 24, 2015. Yepez Decl. ¶ 4. On the night of December 23, 2014, Mr. Charlton was involved in a physical altercation with Francisco Yepez, a correctional officer at EOCI. Charlton Decl. 1; Yepez Decl. ¶¶ 7-9. The altercation occurred in the television room of the A-3 housing unit and, during the altercation, Officer Yepez discharged oleoresin capsicum spray ("pepper spray") into the face and body of Mr. Charlton. Charlton Decl. 1; Yepez Decl. ¶¶ 5-6, 9. Mr. Charlton was removed from the television room shortly after the altercation and taken to the Disciplinary Segregation Unit ("DSU"). Charlton Decl. 1-2; Walker Decl. ¶ 8. He remained in disciplinary segregation until December 26. Charlton Decl. 3; Walker Decl. ¶¶ 19-20.

The parties agree that Officer Yepez and Mr. Charlton engaged in a verbal exchange prior to their physical altercation. At approximately 8:30 PM, Officer Yepez was walking through the television room when Mr. Charlton stated to him, "Look, I'm turning around in the TV room." Yepez Decl. ¶ 5. This comment was made in response to an earlier admonishment by Officer Yepez that Mr. Charlton should stop "turning in his chair and talking" while other inmates are watching television. Yepez Decl. ¶¶ 5-6. Officer Yepez, perceiving the remark as "inappropriate and disrespectful," returned to the small Officer's Station at the back of the room and summoned Mr. Charlton over the public address system. Charlton Decl. 1; Yepez Decl. ¶¶ 6-7.

On Mr. Charlton's version of events, Officer Yepez proceeded to "initiate[ ] an argument that resulted in his use of [pepper spray]," though Mr. Charlton makes no other representations

about the substance of that argument or why it resulted in the use of force. *See* Charlton Decl. 1-3. Officer Yepez recounts that he asked Mr. Charlton why he had "mock[ed]" him in the television room and that Mr. Charlton "denied" having done so. Yepez Decl. ¶ 7. Apparently not satisfied with Mr. Charlton's denial, Officer Yepez ordered him back to his cell. Yepez Decl. ¶ 7. Instead of following the order, Mr. Charlton "came around the [sliding door of] bars and entered the officer's station while complaining about the rules." Yepez Decl. ¶ 7.

According to Officer Yepez, Mr. Charlton ignored two more directives to exit the Officer's Station and "rushed toward[ ]" Officer Yepez, yelling "I'll show you what disrespect is." Yepez Decl. ¶ 7. Mr. Charlton then "began throwing closed fist blows" to Officer Yepez's head. Yepez Decl. ¶ 7. Officer Yepez recalls that the blows dislodged his glasses and "pushed [him] back into the corner of the officer's station." Yepez Decl. ¶ 8. After activating his body alarm and calling for help, Officer Yepez "used a focused blow" to Mr. Charlton's head and created a "small amount of distance" from Mr. Charlton. Yepez Decl. ¶ 9. This allowed Officer Yepez to retrieve his pepper spray and "deliver one short burst" to Mr. Charlton's face. Yepez Decl. ¶ 9.

Mr. Charlton states that, upon being hit with the pepper spray, he "entered an altered [and] confused state of consciousness with a memory black-out [sic]." Charlton Decl. 1. This lapse in memory notwithstanding, Mr. Charlton recalls, and Officer Yepez agrees, that he asked Officer Yepez, "[W]hy did you spray me?" Charlton Decl. 1; Yepez Decl. ¶ 9. According to Mr. Charlton, Officer Yepez then "used a continuous stream of [pepper spray] directly into [his] face, neck[,] and upper body." Charlton Decl. 1. The stream of pepper spray continued even as Mr. Charlton "exited the station and had turned [his] back to [Officer Yepez]." Charlton Decl. 1. Officer Yepez contends that Mr. Charlton "advanced on him again" after the initial burst of pepper spray, prompting him to use the "continuous stream" of spray. Yepez Decl. ¶ 9.

In addition to the parties' own accounts, the record also includes surveillance footage of the argument and ensuing physical altercation. *See* Walker Decl. Att. 4 ("Att."). Although the footage is without audio and captured from across the television room, it clearly shows the movements of both parties. In the footage, Mr. Charlton can be seen walking over to the Officer's Station and speaking with Officer Yepez. Att. 4 at 02:30-50. The exchange lasts about twenty seconds and, during that time, Officer Yepez remains calmly seated behind the counter. Att. 4 at 02:30-50. The exchange escalates when Mr. Charlton abruptly places his water container on the ground and walks around the counter. Att. 4 at 02:50-53. The parties, now face-to-face inside the Officer's Station, continue talking for about 3 seconds. Att. 4 at 02:53-56.

At that point, Officer Yepez begins to stand and reach his left hand back for a cannister of pepper spray. Att. 4 at 02:50-56. Before Officer Yepez can bring his arm forward, however, Mr. Charlton grabs it with his right hand and strikes Officer Yepez in the face. Att. 4 at 02:56-58. For the next thirty seconds, Mr. Charlton delivers blow after blow to the head and neck area of Officer Yepez, who gets pinned in the back corner of the Officer's Station. Att. 4 at 02:57-03:27. When Officer Yepez finally delivers a direct blow to Mr. Charlton's head, Mr. Charlton staggers back and Officer Yepez is able to bend down and retrieve his pepper spray from the floor. Att. 4 at 03:27-29. Although the spray itself is not captured by the surveillance footage, Officer Yepez can be seen pointing the spray canister at Mr. Charlton's face. Att. 4 at 03:29. Mr. Charlton delivers several more blows before recoiling when Officer Yepez trains the canister on him a second time. Att. 4 at 03:33-35. Now clutching his face, Mr. Charlton turns to exit the Officer's Station but, before fully exiting, turns back to hurl a radio at Officer Yepez. Att. 4 at 03:35-37.

The parties agree that Mr. Charlton was next subdued by several responding officers and escorted to the DSU. Charlton Decl. 1-2; Walker Decl. ¶ 8. Officer Yepez, for his part, was

transported to a nearby hospital and treated for a broken nose. Yepez Decl. ¶ 11. In photographs taken shortly after the incident, Officer Yepez's face is covered in blood and the front of his shirt stained with splashes of the same. Att. 3 at 47. Separate photographs show the bottoms of Mr. Charlton's shirt sleeves saturated with blood and his face covered with pepper spray and mucus. Att. 7 at 1-2, 5-6. Although no blood is visible on his face, Mr. Charlton's skin appears red and inflamed where it has been contacted by the pepper spray. Att. 7 at 5-6, 7-9.

According to Mr. Charlton, "despite the clear fact" that he was "covered" with pepper spray and "desperately needed either medical attention" or a "shower," he was promptly "chained to the wall in a small [DSU] holding cell [with] no running water, no toilet, no bed, and no ventilation." Charlton Decl. 1-2. Officer Fitzgerald notes that pepper spray was visible on Mr. Charlton's "face, hands, and clothing" immediately after the altercation and at least one officer in the DSU recalls that Mr. Charlton was "complaining about the effects of the [pepper spray]." Att. 3 at 18, 32. Sergeant Arguello states that, "due to [Mr.] Charlton being sprayed," he was issued "the proper towels to help clean up the spray" and monitored by Officers Duncan, Reidmann, and Olsen for "30 minutes in order to assist him to decontaminate." Att. 3 at 38. Mr. Charlton, however, contends that he was provided only with "a small thin facecloth" and that the facecloth just "served to spread the [pepper spray] and rub it into [his] skin." Charlton Decl. 2; *see also* Att. 3 at 14.

Mr. Charlton also recalls that he requested and was denied decontamination or other medical attention on three separate occasions. *See* Charlton Decl. 2-3.

On the first occasion, at 8:55 PM, Mr. Charlton states that he asked "to see a doctor" when Officer Reidmann and Nurse Persinger entered his cell to conduct an "unclothed body search." Charlton Decl. 2. According to Mr. Charlton, Nurse Persinger, who had covered her face in a "surgical mask to avoid the strong fumes," stated that she would "make sure" Mr. Charlton did not

see a doctor. Charlton Decl. 2. On the second occasion, at 9:05 PM, Mr. Charlton states that he "plea[ded] for relief from the agony" when Officers Duncan, Olsen, and Reidmann entered his cell to adjust his restraints, but was again denied help. Charlton Decl. 2. On the final occasion, at 10:55 PM, Mr. Charlton states that he "started banging the back of [his] head against the cell wall to get attention to [his] pain, discomfort[,] and medical needs." Charlton Decl. 2. In response, Officers Duncan, Willingham, Kropornicki, and Reidmann, as well as Sergeant Arguello and Nurse Persinger, entered his cell, but only to apply new restraints. Charlton Decl. 2-3.

At 12:45 AM on December 24, Lieutenant Peters, who had been in the vicinity of Mr. Charlton's cell for the prior two hours, determined that Mr. Charlton was calm enough to be released from his restraints. Att. 3 at 42. He supervised as several other officers removed the restraints and had Mr. Charlton moved to a new DSU cell on "suicide watch." Charlton Decl. 3; Walker Decl. ¶ 16; Att. 3 at 42. According to Mr. Charlton, the new cell had "no soap or effective running water" and officers "would only turn on . . . enough water [for him] to have a very short drink or flush the toilet." Charlton Decl. 3. He was moved to a DSU cell with running water on December 25, but it was not until December 26 that Mr. Charlton was finally "allowed to shower." Charlton Decl. 2; *see also* Walker Decl. ¶ 20 (noting no running water until December 26).

Mr. Charlton recounts that, for the duration of this four-day ordeal, the pepper spray was "in [his] eyes and nose," as well as "eating into [his] skin," causing a "constant burning pain." Charlton Decl. 3. He alleges that "[t]he skin on [his] face, neck, upper chest[,] and back has been permanently damaged" and "continues to burn and itch." Charlton Decl. 3. Mr. Charlton further claims that, despite his "crying need to get to the showers/proper medical care," each of the named defendants "did nothing . . . but unnecessarily let [him] suffer great pain and lasting injury."

Charlton Decl. 3. Indeed, Mr. Charlton represents that, although his injuries remain "visibly apparent," he "never received proper medical treatment" while at EOCI. Charlton Decl. 3.

## STANDARD

A district court must award summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the case and an issue is "genuine" if a reasonable jury could find in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citation omitted). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the movant carries her burden, then the non-moving party must present "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (quotation marks omitted) (citing Fed. R. Civ. P. 56(e)). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to avoid summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## DISCUSSION

Defendants move for summary judgment as to each of Mr. Charlton's claims. They raise three main arguments. First, Defendants argue that Mr. Charlton's claims naming them in their official capacities are barred by the Eleventh Amendment. Second, Defendants argue that, to the extent Mr. Charlton seeks declaratory and injunctive relief, his claims are mooted by his release from custody. Finally, Defendants argue that they are entitled to qualified immunity from Mr. Charlton's claims for damages because Mr. Charlton was never deprived of a "clearly established" right under the Eighth or Fourteenth Amendments.

As an initial matter, the Court agrees with Defendants' first and second arguments. The Supreme Court has long held that, absent an express waiver by the state or a valid congressional override, the Eleventh Amendment bars suits for damages against a state and its agencies in federal court. *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). This jurisdictional bar applies with equal force to suits for damages against the employees of a state when an employee is sued in her "official capacity." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (quotations and citations omitted). In addition, "[a]n inmate's release from prison while [her] claims are pending generally will moot any claims for injunctive relief." *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012) (quotations and citation omitted). The same is true of "claims seeking declaratory relief." *Id.* (citation omitted). Defendants are therefore granted summary judgment on Mr. Charlton's claims against them in their official capacities and, separately, in so far as Mr. Charlton seeks declaratory and injunctive relief against them in their individual capacities.

Mr. Charlton's remaining claims—those seeking damages against Defendants in their individual capacities—turn on whether Defendants are entitled to qualified immunity. The doctrine of qualified immunity "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quotations and citations omitted). In determining whether a government official is entitled to qualified immunity, a court must consider "whether there has been a violation of a constitutional right," and, if so, "whether that right was clearly established at the time of the [official's] alleged misconduct." *Jessop v. City of Fresno*, 918 F.3d 1031, 1034 (9th Cir. 2019). It is within a court's discretion to "determine which prong of qualified immunity should be analyzed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Since Defendants here contend that they are entitled to qualified immunity from all of Mr. Charlton's claims for damages, the Court analyzes each one in turn.[2]

I.  Eighth Amendment Excessive Force Claim.

Mr. Charlton alleges that Officer Yepez used excessive force against him when, knowing that Mr. Charlton suffers from mental illness, he provoked Mr. Charlton into a physical altercation for the purpose of discharging pepper spray into his face and body.[3]  A prison official violates an inmate's Eighth Amendment right to be free from "cruel and unusual punishment" when she employs "excessive force" against the prisoner.  *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002).  To satisfy the excessive force threshold, a prison official must apply the force "maliciously and sadistically for the very purpose of causing harm."  *Whiteley v. Albers*, 475 U.S. 312, 320-21 (1986).  This is a subjective standard requiring that an official use force with the "intent to harm," *Robins v. Meecham*, 60 F.3d 1436, 1440 (9th Cir. 1995), and not merely in a "good faith effort to maintain or restore discipline," 475 U.S. at 320.  In deducing the purpose for which an official used force, courts often consider "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible official[ ]; and (5) any efforts made to temper the severity of [the] response."  *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

---

[2] The parties do not dispute that, as required by 42 U.S.C. § 1983, the alleged conduct of each defendant occurred "under color of state law."  *Long v. Cty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).

[3] Mr. Charlton names all seventeen defendants in his excessive force claim.  *See* Fourth Am. Compl. ("FAC") ¶¶ 66 (naming "defendants" generally).  As he appears to concede, however, the evidence and pleadings reflect that only Officer Yepez was involved in the underlying physical altercation.  *See* FAC ¶¶ 29-33, 66 (naming "defendants" generally, but making no specific allegations as to any defendant other than Officer Yepez, including with respect to supervisory liability); Att. 3 at 4-67 (reflecting that Officer Yepez and Mr. Charlton were involved in a physical altercation); Att. 4 at 02:57-03:39 (showing Mr. Charlton engaged in a physical altercation with just one other person).  Because "[l]iability under § 1983 must be based on the personal involvement of [each] defendant," and the record is devoid of evidence that anyone other than Officer Yepez could have been "personally involved" in the alleged rights deprivation, summary judgment on the excessive force claim is granted on that ground alone as to the other defendants.  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (citation omitted).

Here, Mr. Charlton identifies no evidence from which a reasonable jury could infer that Officer Yepez deployed his pepper spray with the intent to harm Mr. Charlton. The crux of Mr. Charlton's argument is that Officer Yepez bated him into a position which would justify the use of force. In his declaration, however, Mr. Charlton merely states that Officer Yepez "initiated an argument" and that the argument "resulted" in the use of pepper spray. Charlton Decl. 1. He does not assert that Officer Yepez initiated the physical altercation, threatened him with violence, or was even verbally abusive. To the contrary, it is uncontradicted that Officer Yepez summoned Mr. Charlton from the television room to reprimand him for earlier declaring that he was "turning around" in his chair and order Mr. Charlton back to his cell. Yepez Decl. ¶¶ 5-7. There is no evidence that the "argument" was more than a dispute over prison rules or that Officer Yepez sought to instigate a fight. A jury could, potentially, find that Officer Yepez unnecessarily reprimanded Mr. Charlton and abused his authority by ordering Mr. Charlton back to his cell. It would be an unwarranted inferential leap, however, to conclude that arbitrary punishment alone demonstrates the requisite intent to provoke a harmful physical altercation.

A close examination of the surveillance footage bolsters that conclusion. The video shows Officer Yepez return to the Officer's Station adjoining the television room and, according to the parties' accounts, summon Mr. Charlton over the intercom. Att. 4 at 02:14; Yepez Decl. ¶¶ 5-7; Charlton Decl. 1. Mr. Charlton walks over to the Officer's Station and can be seen speaking with Officer Yepez. Att. 4 at 02:30-50; Charlton Decl. 1. The "argument" lasts about twenty seconds and, during that time, Officer Yepez remains calmly seated behind the counter, without his pepper spray in hand. Att. 4 at 02:30-50. It is only when Mr. Charlton abruptly places his water container on the ground and walks behind the counter that Officer Yepez begins to stand and reach back for his cannister of pepper spray. Att. 4 at 02:50-56. Even then, several seconds elapse between the

moment when Mr. Charlton comes within striking distance of Officer Yepez's face and the moment when Officer Yepez rises from his seat. At that point, Mr. Charlton grabs Officer Yepez's arm and begins striking his face. Att. 4 at 2:56-58. Thus, even going beyond Mr. Charlton's declaration to assume that Officer Yepez verbally abused and arbitrarily punished him, no jury could infer that Officer Yepez—seated and unarmed—anticipated a physical altercation.

In his brief, Mr. Charlton attempts to characterize Officer Yepez's first use of pepper spray as preceding the extended period of blows. The evidence, even when viewed in a light most favorable to Mr. Charlton, does not support that characterization of events. Mr. Charlton's declaration, which is the evidence on which his brief is based, reflects that the pepper spray was not deployed until much later in the altercation. Mr. Charlton states that Officer Yepez "initiated an argument that resulted in the use of 'a short burst of [pepper spray]' to my face." Charlton Decl. 1. The internally quoted language is taken from Officer Yepez's declaration, in which he describes using of a "short burst" after the initial period of fighting. *Compare* Charlton Decl. 1 *with* Yepez Decl. ¶ 9. Still, even assuming that the pepper spray was administered *before* the ensuing brawl, it is uncontradicted, and the surveillance footage shows, that Mr. Charlton had already approached and placed his right hand on Officer Yepez when the "short burst" would have struck him. Att. 4 at 02:57. No matter how verbally abusive Officer Yepez may have been, once he was contacted by Mr. Charlton, no finder of fact could conclude that it was unreasonable for him to deploy a single burst of pepper spray—let alone that he did so for the purpose of harming Mr. Charlton. Indeed, regardless of when Mr. Charlton was first sprayed, the fact remains that Officer Yepez was unprepared to use force until the moment before he was grabbed.

Finally, Mr. Charlton argues that, after this initial contact, Officer Yepez sadistically assaulted him for forty-five seconds. In his declaration, Mr. Charlton simply states that, after first

being sprayed, he "entered an altered and confused state . . . with a memory black-out [sic]."[4]

Charlton Decl. 1. He then recalls asking, "why did you spray me?" and facing a "continuous stream of [pepper spray] directly into [his] face, neck, and upper body even as [he] exited the station and turned [his] back to [Officer Yepez]." Charlton Decl. 1. Notably, Mr. Charlton makes no claims about the actual fight. The surveillance footage, however, shows Officer Yepez trapped in a corner as Mr. Charlton delivers blow after blow to his head and neck area.[5] Att. 4 at 02:57-03:27. After about thirty seconds, Officer Yepez manages to land a defensive blow to the face and, having created some space from Mr. Charlton, retrieve his pepper spray from the floor. Att. 4 at 03:27-34. On Mr. Charlton's revised version of events, this is the moment when Officer Yepez delivers a "continuous steam" of pepper spray to his face. Charlton Decl. 1. Mr. Charlton finally recoils and begins to exit the Officer's Station, but not before landing several more punches and, at the last moment, turning around to hurl a radio at Officer Yepez. Att. 4 at 03:34-39; Yepez Decl. ¶ 9. Based on this evidence, there are no facts from which a jury could infer that Officer Yepez acted with an improper motive or even in an objectively unreasonable manner.

---

[4] As discussed above, the first burst of spray was likely after Mr. Charlton had been punching Officer Yepez for nearly thirty seconds; nevertheless, the Court, viewing the evidence in a light most favorable to Mr. Charlton, continues to assume that this first burst of spray was right after Mr. Charlton placed his hand on Officer Yepez's arm. That assumption does not change the fact that Mr. Charlton's declaration makes no representations about the thirty seconds following the alleged first use of pepper spray—during which time he can be seen repeatedly punching Officer Yepez—nor would a short burst of pepper spray justify Mr. Charlton's assault on Officer Yepez or prohibit Officer Yepez from later defending himself in good faith with physical blows or additional pepper spray.

[5] In his brief, Mr. Charlton argues that the surveillance footage shows precisely the opposite—that Officer Yepez was the one delivering a flurry of punches. However, the actual evidence offered by Mr. Charlton—consisting solely of his declaration—includes no such claim. *See* Charlton Decl. 1-3. Without competing evidence, there can be no dispute of fact. Nevertheless, even if Mr. Charlton had stated in his declaration that Officer Yepez was the one who gratuitously delivered blows, the dispute of fact would not be genuine because the surveillance footage speaks for itself. Although the footage is distant, no reasonable jury viewing the footage could find that Officer Yepez delivered more than, at the very best, a handful of defensive blows. This conclusion is made inescapable by photographs taken shortly after the incident, the contents of which show that (1) Officer Yepez's face was covered in blood, (2) no blood was visible on Mr. Charlton's face, (3) the lower portions of Mr. Charlton's shirt sleeves were covered in blood, and (4) no blood was visible on the hands of Officer Yepez. *Compare* Att. 3 at 47 *with* Att. 7 at 1-2.

II. <u>Eighth Amendment Deliberate Indifference Claim</u>.

Mr. Charlton next alleges that Defendants were deliberately indifferent to his serious medical need when they prevented him from washing off the pepper spray for four days.[6]  A prison official violates an inmate's Eighth Amendment right to be free from "cruel and unusual punishment" if she is "deliberately indifferent" to the inmate's "serious medical need."  *Estelle v. Gamble*, 429 U.S. 97, 105 (1976).  To prevail on a deliberate indifference claim, an inmate must demonstrate that (1) she had an objectively serious medical need, (2) the prison official was deliberately indifferent to that need, and (3) this indifference caused her harm.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citations omitted).  A serious medical need is one which, without treatment, "could result in further significant injury or the unnecessary and wanton infliction of pain."  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991) (citation omitted).  Defendants here do not contest that Mr. Charlton's prolonged skin and respiratory exposure to the pepper spray was a serious medical need or that it resulted in some level of harm to Mr. Charlton.  *See Clement*, 298 F.3d at 904 (holding that the "painful effects" of pepper spray constitute a serious medical need).  They do, however, contest that any of them were deliberately indifferent to those risks.

An official is deliberately indifferent to an inmate's serious medical need if she is both "aware of . . . a substantial risk" to the inmate's health or safety and "disregards [that] risk" by failing to take reasonable ameliorative steps.  *Gibson v. Cty. of Washoe*, 290 F.3d 1175, 1188 (9th

---

[6] In the FAC, Mr. Charlton further contends that he was denied adequate mental health care.  FAC ¶¶ 63-65.  Nevertheless, he presents no evidence pertaining to his care (e.g., medical records), does not identify the persons who would have been responsible for administering such care, and offers no evidence from which a finder of fact could infer that any of the named defendants were both aware of his need for additional mental health care and consciously disregarded the risks of failing to provide additional care (i.e., deliberate indifference).  He also fails to offer any expert testimony on the care he allegedly should have received.  An official cannot be liable absent personal involvement in a constitutional violation and there is no evidence from which a trier of fact could infer that any defendant was involved in Mr. Charlton's mental health care, acted negligently in providing that care, or was deliberately indifferent to a specific mental health need.  As such, Defendants are granted summary judgment on the portion of Mr. Charlton's deliberate indifference claim concerning the adequacy of his mental health care.

Cir. 2002) (quotations and citation omitted), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). This is a subjective standard, requiring not only that the official be aware of the facts from which one could infer a substantial risk, but also that she actually draw that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). As the Supreme Court has made clear, mere negligence in diagnosing or treating a medical condition, without more, does not violate an inmate's rights. *Estelle*, 429 U.S. at 106. Instead, an inmate must show that the denial, delay, or otherwise unreasonable course of medical care was taken in conscious disregard of an excessive risk to her health or safety. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citation omitted). Whether an official "has the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Conn v. City of Reno*, 591 F.3d 1091, 1097 (9th Cir. 2010).

The Ninth Circuit has long recognized that the failure to properly decontaminate a prisoner exposed to pepper spray can support a deliberate indifference claim. *Clement*, 298 F.3d at 904-06. In *Clement*, the Ninth Circuit affirmed a lower court's denial of summary judgment to prison officials who had withheld showers and other medical care from inmates exposed to the second-hand effects of pepper spray. *Id.* at 902, 905. The plaintiffs in that case were exposed to fumes from pepper spray deployed against inmates in neighboring cells and suffered from "stinging sensations in the[ir] eyes and on the[ir] skin," as well as "asthma attacks [and] difficulty breathing." *Id.* at 902. Although the plaintiffs had access to soap and running water, prison officials denied them showers and other medical attention for four hours. *Id.* In holding that the plaintiffs' claims could proceed to trial, the court found that there was a genuine dispute of fact as to whether the "defendants were subjectively aware of the risk of serious injury" when they denied shower access. *Id.* at 905. The court reasoned, in particular, that a jury could infer the officials'

requisite knowledge based on declarations in which the plaintiffs alleged that (1) they had requested showers and other medical care, (2) they were visibly suffering the effects of exposure, and (3) several prison officials had themselves taken measures to protect their eyes and lungs from the fumes. *Id.* "While a resolution of the factual issues may well relieve the prison officials of any liability in this case," the court opined, "a jury might conclude that the officers were deliberately indifferent to such needs during the four-hour period." *Id.* at 906.

The record here, as in *Clement*, contains ample evidence from which a jury could infer that multiple defendants were aware of Mr. Charlton's need to decontaminate and yet withheld the means to do so. In his declaration, Mr. Charlton represents that he "requested to see a doctor," later pleaded "for relief from the agony of the [pepper spray]," and eventually resorted to "banging the back of [his] head against the cell wall to get attention to [his] pain, discomfort[,] and medical needs." Charlton Decl. 2. The first request was made in the presence of Nurse Persinger, who was wearing a "surgical mask to avoid the strong fumes of the [pepper spray]," and Officer Duncan; the second request was made in the presence of Officers Duncan, Olsen, and Reidmann; and the third request was made in the presence of Officers Duncan, Willingham, Kropornicki, and Reidmann, as well as Sergeant Arguello and Nurse Persinger. Charlton Decl. 2. Officer Duncan acknowledges that he heared at least one of these requests to decontaminate. Att. 3 at 32. Although Sergeant Aguero represents that he "issued [Mr. Charlton] proper towels to help clean up the spray," Mr. Charlton contends that he was only provided a "small thin facecloth" and that the rag merely served to spread around the chemicals. Att. 3 at 38; Charlton Decl. 2; *see also* Att. 3 at 14. Defendants also contend that Mr. Charlton never requested a "shower," but Mr. Charlton was not required to utter a magic word and, to the extent they contest Mr. Charlton's representation that he asked for "relief" or other medical care, that is a question of fact for the jury.

The open and obvious nature of Mr. Charlton's physical symptoms further supports the inference that the attending officers were aware of his serious medical need. In photographs of Mr. Charlton taken within 2.5 hours of the incident, large amounts of pepper spray, mucus, facial swelling, and inflamed skin are clearly visible. Att. 7 at 5-20. The incident statements of some responding officers also note that pepper spray was visible on Mr. Charlton's face and the statements of Sergeant Arguello and Officer Duncan reflect that the attending officers were aware of the same. Att. 3 at 14, 18, 32, 38. Correctional officers carry pepper spray *because* it is designed to cause pain and discomfort; indeed, no officer would carry or be issued pepper spray as a means of self-defense if it were not universally understood that discharging the spray on an inmate would have that effect. A jury could, as such, reasonably infer that the officers here, who were working in a prison where pepper spray was distributed, were subjectively aware that Mr. Charlton's known exposure to the same—unlike a more latent medical need—posed a substantial risk of harm. At the very least, even if the officers were ignorant of the effects of pepper spray, a jury could find that Mr. Charlton's physical appearance corroborated his verbal complaints, lending further support to the inference that the attending officers were aware of his serious medical need.

Defendants argue in the alternative that Mr. Charlton's behavior made decontamination impracticable. They cite an out-of-district case for the proposition that there can be no Eighth Amendment liability when an inmate's own actions prevent treatment. *See Provencio v. Vazquez*, No. 1:07-cv-00069, 2010 WL 2490937 (E.D. Cal. June 16, 2010). In *Provencio,* however, the plaintiff never requested treatment, was persistently combative with prison officials, and had to be placed in a spit mask to prevent bodily fluids from contacting officials. *Id.* at *1. Indeed, each time officials attempted to remove the plaintiff's mask and flush his face with water, he would spit on them. *Id.* Here, by contrast, officials were never forced to cover Mr. Charlton's face and there

is no evidence that Mr. Charlton remained combative once he was placed in segregation. *See* Att. 3 at 18-42. Instead, when viewed in a light most favorable to Mr. Charlton, the evidence shows that he was restrained only because of self-harming behavior intended to convey his suffering and, just as importantly, that no attending officer unsuccessfully attempted to properly decontaminate him. *See* Charlton Decl. 2; Att. 3 at 18-42. A jury could reasonably infer that, if Defendants were able to shackle Mr. Charlton to a cell wall and later place him in a restraint chair, they could have flushed his face, even if only after he was restrained. And, to the extent Mr. Charlton was combative, that does not excuse the failure provide him with the means to decontaminate once he was calm and out of restrains. Charlton Decl. 2-3; Att. 3 at 39-42.

Finally, in addition to the above-named officials who interacted with Mr. Charlton, seven others are named in the FAC. In his declaration, Mr. Charlton makes no allegations against six of them—Officers Fitzgerald, Ware, Davis, Bruning, and Gonzalez, as well as Sergeant Gallino, Captain Walker, and Superintendent Taylor—and no portion of the record supports the inference that they were aware of Mr. Charlton's serious medical need. They are therefore granted summary judgment. Lieutenant Peters, however, was not only present during much of Mr. Charlton's time in segregation but was supervising other officers and entered the cell multiple times. Att. 3 at 41-42. He would have seen and heard Mr. Charlton in the same manner as the officials identified in Mr. Charlton's declaration and he would have been familiar with prison regulations requiring that an inmate "be permitted to wash [his] face, eyes, and other exposed skin areas as soon as possible." OAR-291-013-0104(5). Lieutenant Peters would have also had the authority to order additional decontamination or prevent the other officers from withholding it. *See Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (holding that supervisors may be liable for the acts of subordinates if they (1) "set in motion a series of acts by others, or knowingly refuse[ ] to terminate

a series of acts by others, which they knew or reasonably should have known[ ] would cause others to inflict the constitutional injury" or (2) "acquiesce[ ] in the constitutional deprivations" by the subordinates). Lieutenant Peters is therefore denied summary judgment.

III. Fourteenth Amendment Procedural Due Process Claim.

Finally, Mr. Charlton alleges that Defendants infringed upon several state-created liberty interests without affording him due process of law. Specifically, Mr. Charlton argues that Defendants arbitrarily infringed upon his interests in being free from (1) intentional verbal harassment and public humiliation designed to provoke an inmate into a position which would justify a prison official's use of force; (2) continued and prolonged exposure to a discharged chemical agent; and (3) a prison official's use of a chemical agent known by that official to exacerbate the targeted inmate's epilepsy or other convulsive disorder.[7]

The Due Process Clause of the Fourteenth Amendment protects inmates from, inter alia, being deprived of a liberty interest "without due process of law." U.S. Const. amend. XIV, § 1; see also Wilkinson v. Austin, 545 U.S. 209, 221 (2005). To prevail on a procedural due process claim, an inmate must establish *both* that she possessed a recognized "liberty interest" and that she was deprived of the same without adequate process. *See Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). As relevant here, an inmate can only claim a state-created liberty interest in avoiding actions which "inevitably affect the duration of his sentence" or impose an "atypical and significant hardship in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Wilkinson*, 545 U.S. at 223 (citation omitted). If an inmate can

---

[7] The liberty interests claimed by Mr. Charlton are lifted from three administrative rules promulgated by the Oregon Department of Corrections: OAR-291-013-0065(6), OAR-291-013-0104(5)(c), and OAR-291-013-0104(5)(f). Although courts are not per se prohibited from considering prison regulations when determining whether an inmate possesses a protected liberty interest, "[t]he touchstone of the inquiry," as described below, "is not the language of regulations regarding [an inmate's] conditions [of confinement] but the nature of those conditions themselves in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 223 (internal quotations and citation omitted).

establish that she was subjected to such an action, she must then demonstrate—based upon the liberty interest at stake, the government's own interests, and the likelihood of an erroneous deprivation—that she was afforded inadequate procedural protections. *Wilkinson*, 545 U.S. at 224-25 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Mr. Charlton's procedural due process arguments are a transparent effort to shoehorn his Eighth Amendment claims into a less demanding substantive posture. Unlike claims for excessive force or deliberate indifference, a claim alleging the denial of adequate process requires no showing of a prison official's culpable mental state; rather, it simply requires an inmate to demonstrate that she was subjected to an objectively onerous condition and that the condition was imposed without certain protections. When, as here, the true nature of the theory is that no amount of process would justify the alleged deprivation, an inmate's claim is properly characterized as one for a denial of substantive due process. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). The Supreme Court has repeatedly held, however, that "[w]here a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing" that behavior. *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citation omitted). Since the Eighth Amendment provides "explicit limitations on the type of government conduct challenged by [Mr. Charlton]," that amendment, not the Fourteenth Amendment, must govern the resolution of his claims. *Armendariz v. Penman*, 75 F.3d 1311, 1320 (9th Cir. 1996).

Still, even if the Court assumes that the interests identified by Mr. Charlton are constitutionally protected, Mr. Charlton fails to cite any cases which have "clearly established" those liberty interests or the process due to an inmate deprived of the same. The deprivation of a liberty interest is "not in itself unconstitutional; what is unconstitutional is the deprivation of such

an interest *without due process of law*." *Zinermon*, 494 U.S. at 125 (emphasis in original).

Tellingly, Mr. Charlton never even attempts to describe the procedural safeguards to which he was

entitled, let alone their explication in cases with analogous facts. *See Baker v. Racansky*, 887 F.2d

183, 187 (9th Cir. 1989) (quotations and citation omitted) (explaining that a procedural right "can

rarely be considered clearly established," at least "in the absence of closely corresponding factual

and legal precedent"). Mr. Charlton also cites no cases in which the same or similar liberty

interests received protection. As such, even assuming the validity of Mr. Charlton's claimed

liberty interests, Defendants would be entitled to qualified immunity because "the unlawfulness of

[their] actions" was not "apparent in light of preexisting law." *Sorrels v. McKee*, 290 F.3d 965,

970 (9th Cir. 2002) (quotations and citations omitted).[8]

## CONCLUSION

Defendants' Motion for Summary Judgment, ECF No. 78, is GRANTED in part and

DENIED in part. Defendants are GRANTED summary judgment on Mr. Charlton's excessive

force and procedural due process claims. Officers Yepez, Fitzgerald, Ware, Davis, Bruning, and

Gonzalez, as well as Sergeant Gallino, Captain Walker, and Superintendent Taylor, are also

GRANTED summary judgment on Mr. Charlton's deliberate indifference claim. Officers Duncan,

Olsen, Reidmann, Willingham, and Kropornicki, as well as Sergeant Arguello, Lieutenant Peters,

and Nurse Persinger, are DENIED summary judgment on Mr. Charlton's deliberate indifference

claim in so far as Mr. Charlton seeks damages against them in their individual capacities. Mr.

---

[8] There is also no evidence from which a reasonable jury could find that Defendants deprived Mr. Charlton of the first and third claimed liberty interests. First, for the same reasons discussed in Part I, no reasonable jury could find that Mr. Charlton was bated into a position which would justify the use of force by Officer Yepez. Second, there is no evidence—including in Mr. Charlton's own declaration—that Officer Yepez was aware of Mr. Charlton's alleged "seizure disorder." Charlton Decl. 1. The absence of any genuine dispute of fact with respect to either theory provides an additional basis for granting summary judgment to Defendants.

Charlton is barred from pursuing his deliberate indifference claim against any defendant in his or her official capacity and from seeking declaratory or injunctive relief.

IT IS SO ORDERED.

DATED this 27th day of June, 2019.

/s/ Michael J. McShane_____
Michael J. McShane
United States District Judge